Taggart HOOPER, Appellant,

v.

Sabra HOOPER, Appellee.

No. S–12356.

Supreme Court of Alaska.

July 25, 2008.

---

Herbert M. Pearce, Law Office of Herbert M. Pearce, Anchorage, for Appellant.

No brief filed by Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

When Sabra and Taggart Hooper divorced, the superior court awarded nearly sixty-seven percent of the main marital estate to Sabra, and thus gave her about $110,000 more than it gave Taggart. Taggart challenges this division and other rulings. We affirm the property division because we conclude that it was supported by sufficient findings of fact and that the court did not abuse its discretion. But because some other awards require additional explanation, we vacate those awards and remand.

## II. FACTS AND PROCEEDINGS

Sabra and Taggart Hooper married in 1991, and in 2004 Sabra filed for divorce. The parties agreed as to custody for their two children, but were unable to agree on other issues. In late 2005 the superior court conducted a trial as to the disputed issues; both parties testified. In late May 2006 the superior court entered findings of fact and conclusions of law.

The court found that Sabra had not worked fulltime for more than seven years and that her current employment as a part-time teacher's assistant (earning $1,200 net per month during the school year) was reasonable. The court found that Taggart earned "at least $3,000 net per month[ ]." [1]

1. The Final Child Support Order entered in 2006 set basic child support at $885 per month and stated that Taggart's net wages were approximately $3,277. We cannot confirm the accuracy of the $3,277 figure, because the record does not include a signed Alaska Civil Rule 90.3 affidavit current as of the date of trial. An unsigned affidavit stated that Taggart's adjusted annual income was $50,388. Taggart testified that his 2004 gross wages were $64,990. This figure reflected earnings from his full-time job as an aircraft mechanic with the Department of Defense and his part-time job with the Alaska Air National Guard and may have included significant earnings attributable to overtime. There was no trial evidence clearly establishing Tag-

As to the property division issue, the court decided that Sabra was entitled to sixty-seven percent of the estate based on

the length of the marriage, the time Sabra spent raising the children, the relative earning capacities of the two, the disparate incomes of the two, the relatively greater time that Sabra will be rearing the children, and the economic needs of the parties, including Sabra's need for money to refinance the marital home to keep it for the children, if she can, or to pay for costs of repairs in order to sell the house if she must.

The court found that the total value of the marital estate apart from the parties' retirement accounts was $348,537. It then awarded Sabra $229,162 and Taggart $119,375 of the non-retirement account portion of the marital estate. It thus awarded Sabra slightly less than sixty-seven percent of this part of the marital estate. As the superior court observed, sixty-seven percent of this part of the marital estate would have been $233,520. The court noted that although it was awarding Sabra slightly less than sixty-seven percent of the marital estate, it believed the actual division was "fair and equitable, and is close enough to what the court believes is a just division that further refinement is not warranted." The court's awards of this part of the marital assets had the effect of giving Sabra about $110,000 more than they gave Taggart.

As to the retirement accounts, the court stated that Qualified Domestic Relations Orders (QDROs) would be entered awarding Sabra sixty-seven percent of Taggart's unvested Federal Employees Retirement System (FERS) account, Taggart's National Guard pension account, and Sabra's Public Employees Retirement System (PERS) account. By stipulation, the court awarded Sabra all of her Alaska Airlines retirement account.

The portion of the marital assets valued by the court at $348,537 included much of Taggart's Thrift Savings Plan (TSP), which had a marital value of about $194,417 as of July 2005. When Taggart, who had agreed to pay the mortgage on the marital home following separation, did not make some of the 2005 mortgage payments, the court ordered him in mid–2005 to borrow $10,000 from his TSP account so he could continue to make those payments. The monthly mortgage payments were about $1,500. At trial, there was a dispute whether the superior court should treat this loan as marital property, as Taggart contended, or as Taggart's individual property, as Sabra contended. The court's post-trial decision characterized Taggart's mortgage payments following separation as payments in lieu of child support, found that Taggart had agreed to pay the mortgage instead of paying child support, and concluded that the loan would be counted against Taggart's portion of the TSP.

Taggart testified at trial that in August 2005 he had begun paying monthly child support of $500. The findings of fact did not discuss these payments.

The findings and conclusions ordered Taggart to purchase, at his expense, FERS survivor benefits for Sabra. The findings did not determine the cost of these survivorship benefits.

The findings also divided Taggart's employment leave that he had accrued during the marriage. The parties were to determine its value, and Taggart was to cash out sixty-seven percent of the accrued leave and pay that amount to Sabra. The court did not specify whether the leave to be divided included sick leave.

The court also awarded Sabra $3,000 in rehabilitative alimony "to assist her in acquiring new job skills and returning to work." Sabra had requested $10,000 in rehabilitative alimony so she could "complete college and obtain an elementary education degree." The court declined to award that amount, stating that Taggart could not reasonably afford to make payments over three years totaling $10,000 "in addition to his child support and other payments and obligations," and that such an award would be "unfair."

gart's adjusted annual income or bearing on whether his 2004 gross wages were aberrationally high.

The superior court also awarded Sabra attorney's fees of $5,000 "[b]ased on the disparity in income between the parties."[2] It denied her request for an award of nearly $12,000 to cover credit card debt she incurred in paying her legal fees and child expenses. It also denied her request for an award of $21,372 to repay a loan she claimed she had obtained from her mother to support herself and the children after separation.

Taggart appeals. Sabra has filed a notice of non-participation in the appeal.

## III. DISCUSSION

### A. The Court Did Not Err in Awarding Sabra Sixty–Seven Percent of the Marital Estate.

#### 1. Standard of review

Taggart argues that the superior court did not "appl[y] the appropriate legal standards in exercising its broad discretion" when it awarded Sabra approximately sixty-seven percent of the marital estate. He asserts that his argument raises a question of law, to which we apply our independent judgment. But it appears that he also takes issue with the court's findings of fact and its exercise of discretion in applying the factors listed in AS 25.24.160(a)(4). We have held that, "[a]lthough an equal division of property is presumed to be the most equitable, the trial court has broad discretion to deviate from absolute equality."[3] We therefore review

the superior court's decision to award Sabra approximately sixty-seven percent of the estate under the abuse-of-discretion standard of review.

For us to review an award, we must "be informed by the [superior] court what it found to be the ultimate facts upon which it based its conclusion that the property should be divided as it has decreed."[4] Whether there are sufficient findings for informed appellate review is a question of law.[5] We apply our independent judgment to questions of law,[6] and review findings of fact for clear error, a standard met only if, after review of the entire record, we are left with a definite and firm conviction that a mistake was made.[7]

#### 2. Whether the trial court applied the appropriate legal standards

We first consider whether, as Taggart argues, the trial court committed legal error by failing to apply the appropriate legal standards in exercising its broad discretion.

The equitable division of marital assets is a three-step process: first, the court must determine what specific property is available for distribution; second, it must find the value of this property; third, it must decide how an allocation can be made most equitably.[8] In determining the most equitable division, the "starting point is the presumption that an equal division is the most just."[9]

---

2. Sabra was represented by counsel in the superior court.

3. *Ulsher v. Ulsher*, 867 P.2d 819, 822 (Alaska 1994) (affirming award of two-thirds of marital estate to wife where marriage was "of moderate length," wife worked intermittently during marriage, and wife earned half of what husband earned).

4. *Lang v. Lang*, 741 P.2d 1193, 1195 (Alaska 1987) (stating that court must make fact findings that are "sufficiently specific" to indicate basis for property division) (quoting *Merrill v. Merrill*, 368 P.2d 546, 547–48 (Alaska 1962) (footnote omitted)).

5. We have previously stated that "[w]e review the alleged inadequacy of a trial court's fact findings to determine whether they give [us] a clear indication of the factors considered important by the trial court or allow us to determine from the record what considerations were in-

volved." *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 137 (Alaska 1997). We conclude here that this threshold question presents a question of law.

6. *E.g., Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

7. *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005).

8. *Schmitz v. Schmitz*, 88 P.3d 1116, 1122 (Alaska 2004) (citing *Martin v. Martin*, 52 P.3d 724, 726 (Alaska 2002) (citing *Lundquist v. Lundquist*, 923 P.2d 42, 46–47 (Alaska 1996); *Wanberg*, 664 P.2d at 570)).

9. *Burcell v. Burcell*, 713 P.2d 802, 805 (Alaska 1986) (citing *Jones v. Jones*, 666 P.2d 1031, 1034 (Alaska 1983)); *accord Nicholson v. Wolfe*, 974 P.2d 417, 422 (Alaska 1999) (stating that "[a]n equal division of the marital property is pre-

From there, the superior court must consider the *Merrill v. Merrill*[10] factors now codified in AS 25.24.160(a)(4).[11] The superior court may divide the assets and liabilities unequally if it finds that such a division is just after considering the statutory factors.[12]

Before unequally dividing property, the superior court must consider the "necessities" element of AS 25.24.160(a)(4) by specifically discussing the parties' individual needs. We have upheld an unequal division of property in a case in which the superior court discussed each of the statutory factors,[13] and affirmed a fifty-six/forty-four percent property division in a case in which the superior court found the wife needed future income while pursuing a professional degree.[14] Likewise, we have vacated an unequal property division and remanded because the superior court did not appear to discuss the needs of the parties beyond discussing the property available.[15]

The superior court here entered thoughtful and detailed findings of fact discussing all of the relevant factors set out in AS 25.24.160(a)(4).[16] The findings discussed Sabra's "present relative lack of employment skills," the parties' relative earning capacities, the disparity in the parties' incomes, the duration of the marriage, the time Sabra spent and will spend raising the children, and—in a general way—the economic needs of the parties, including Sabra's need for money either to refinance the home or to repair and sell it. The findings also discussed the amount of equity in the home and the exact amount the court was awarding each party from the marital estate, apart from what they were also to receive from the retirement accounts. These findings addressed the appropriate legal standards for property division. The trial court therefore committed no legal error.

■■■ We next consider whether the findings are sufficient for appellate review of the disparate awards challenged by Taggart. In deciding whether to deviate from the pre-

---

sumed to be equitable" and approving the superior court's decision to begin its analysis with this presumption).

**10.** *Merrill v. Merrill,* 368 P.2d 546, 547–48 n. 4 (Alaska 1962).

**11.** *Tybus v. Holland,* 989 P.2d 1281, 1286 (Alaska 1999).

**12.** *Id.* at 1286.

**13.** *Id.*

**14.** *Hayes v. Hayes,* 756 P.2d 298, 300 (Alaska 1988).

**15.** *Walker v. Walker,* 151 P.3d 444, 450–51 (Alaska 2007) (in absence of findings under *Merrill* factors, unequal property division was abuse of discretion).

**16.** AS 25.24.160(a) states in pertinent part:

In a judgment in an action for divorce or action declaring a marriage void or at any time after judgment, the court may provide

. . . .

(4) for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property, including retirement benefits, of either spouse acquired before marriage when the balancing of the equities between the parties requires it; and to accomplish this end the judgment may require that one or both of the parties assign, deliver, or convey any of their real or personal property, including retirement benefits, to the other party; the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:

(A) the length of the marriage and station in life of the parties during the marriage;

(B) the age and health of the parties;

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division.

sumptively appropriate fifty/fifty division, a superior court must consider the statutory factors, including the parties' economic circumstances and "necessities."[17] The superior court did not explain the mathematical process by which it reached a conclusion that Sabra should receive about sixty-seven percent of the marital property, and thus $110,000 more of the non-retirement account property than Taggart received. But the findings discussed the parties' significant income disparity and broadly discussed Sabra's need to keep the family home, if possible. The findings did not directly address the parties' monthly needs. They did not identify Sabra's specific monthly financial necessities,[18] or the value of any extraordinary expenses Sabra might face that might themselves justify the disparity in the awards.[19] On the other hand, Taggart's main property division theme at trial was that Sabra was voluntarily underemployed and capable of earning more than she did. The court rejected Taggart's contention that Sabra had unilaterally chosen not to return to full-time employment; there was no significant dispute that Sabra was disadvantaged economically, to the point the court declined to penalize her after she violated a court order by selling marital property to pay expenses. And when Taggart failed to make several mortgage payments on the marital home in 2005, a foreclosure notice was issued for the marital home occupied by Sabra and the children. As the court noted, this left her in "financial difficulties." The court thus effectively found Sabra had no financial reserves. The trial court's order correctly noted that the parties had "noticeably disparate" incomes, and that Taggart "earns far more" than Sabra and has a

"greater earning capacity." The court found that Taggart "earns at least" $3,000 net monthly, and Sabra earns $1,200 net monthly, during the school year.[20] These figures reflect a roughly 2.5–to–1 disparity in the parties' incomes; that disparity exceeds the approximately 2–to–1 disparity between the parties' property awards. The court also noted that Taggart had regularly deposited more than 7.5 percent of his income in his retirement plans.

The findings and conclusions sufficiently explain why the court awarded Sabra approximately two times what it awarded Taggart. We are therefore able to determine whether the awards were within the superior court's considerable discretion.

This is not to say that the size of the disparity from the fifty/fifty norm for property division does not cause concern. Care must be taken to adhere to the norm unless there are good reasons for deviating from it. Here, the reasons for deviation are sufficient and we are influenced in this conclusion by the relatively modest size of the marital estate.

### 3. Taggart's challenge to specific rulings

█ Taggart also challenges specific rulings of the trial court, although he contends that he is only arguing that the superior court applied the wrong legal standard. Some of these rulings resolved fact disputes or were based on factual findings. Factual findings will not be reversed unless they are clearly erroneous.[21] The others we review for abuse of discretion.[22]

---

17. AS 25.24.160(a)(4)(G); *Veselsky v. Veselsky,* 113 P.3d 629, 637 (Alaska 2005); *cf. Hayes,* 756 P.2d at 300.

18. AS 25.24.160(a)(4)(G).

19. There was no suggestion any possible repair costs would approach $110,000. The court also divided the retirement accounts applying the sixty-seven/thirty-three percentage without specifying the value of these accounts or the net effect. But given the relatively modest values of these accounts (Taggart's FERS account had not vested at the time of trial), the parties' relative youth,

and the court's permissible use of QDROs to divide these accounts, it does not appear that the division of the retirement accounts significantly contributes to the disparity between the awards to Taggart and Sabra.

20. This may understate Taggart's net income. See note 1, above.

21. *Beal v. Beal,* 88 P.3d 104, 110 (Alaska 2004).

22. *Krize v. Krize,* 145 P.3d 481, 483 (Alaska 2006) ("We review property division rulings for abuse of discretion.").

█ Taggart first argues that Sabra refused to return to work fulltime and that this "created financial problems for the parties." He implies that her refusal was contrary to the parties' agreement. The superior court found that Sabra was a part-time Anchorage School District teaching assistant during the school year, that this employment was "reasonable," that she would "slowly re-enter the work force," and that she was not underemployed during the school year.

Taggart testified only that he had expected Sabra to go back to work fulltime when the children were in school. He did not testify that Sabra had refused to return to work fulltime, that she had failed to abide by any agreement between them regarding her employment, or that her part-time schedule created any financial difficulties. Sabra testified that she was in the process of returning to work fulltime, and that the parties had agreed that she would not work at all between 1997 and 2001. The superior court therefore did not clearly err by finding that Sabra's employment was reasonable.

█ Taggart next asserts that Sabra is voluntarily underemployed, because "[t]he evidence presented clearly demonstrated that Sabra had the skills and ability to work full-time at a wage of at least $13.00 an hour." He implicitly argues that such jobs were actually available to Sabra. When asked by Taggart's attorney if she would take a full-time job that paid $13.15 per hour, Sabra testified that she would. She also testified that she thought she could earn $13 per hour. But Sabra did not testify expressly or implicitly that a full-time job paying $13 per hour was available to her. She explained that she no longer has the skills necessary to do the work she had previously done for Alaska Airlines, when she last earned about $13 per hour in full-time employment. Sabra also testified that she had applied for several full-time jobs with the school district and had not been hired. The record does not compel a finding that Sabra actually could have obtained full-time employment for $13 per hour, and it does not demonstrate that the court clearly erred in failing to find that she could have.

The superior court did not clearly err by finding that Sabra's current level of employment was appropriate, given her skills. The court also did not clearly err in finding that she was not underemployed during the school year. And as to summer employment, the court reasoned that while the children were young, child care expenses of at least $750 monthly would be incurred; it seemed to assume that if she worked thirty hours a week at $13 per hour these expenses would consume about fifty percent of her summer earnings. We are unconvinced that this finding and this implicit assumption were clearly erroneous.

Taggart next asserts that Sabra will earn more money in the future, when and if she obtains a teaching degree. But the statute requires the court to consider each party's earning capacity.[23] It does not require the court to consider the party's potential future earning capacity following significant additional education. There was no evidence Sabra would earn a teaching certificate in the near future. She testified she had about ten credit hours and needed about 112 more to obtain a teaching certificate. It was not an abuse of discretion to decline to attribute a teacher's earning capacity to Sabra.

Taggart next asserts that "the trial court also justified [awarding] 67% of the marital estate to Sabra based upon the fact that if she was unable to refinance the home then she would need to 'pay for cost[s] of repairs in order to sell the house if she must.'" We assume Taggart is not contending that the prospect of pre-sale repair expenses was the court's only justification for the disparate award; the findings also discussed a variety of other facts which the court thought rendered a sixty-seven/thirty-three division "fair and equitable." It appears the court regarded pre-sale repair costs as a logical alternative to its finding that Sabra needed money "to refinance the marital home to keep it for the children, if she can. . . ." It also appears, as Taggart argues, that there was no evidence in the record that the house needed repairs, whether or not it had to be sold. But there is likewise no indication the superi-

---

**23.** AS 25.24.160(a)(4)(C).

or court gave the possibility of repair costs significant weight.[24]

Taggart also seems to argue that in determining whether Sabra was to receive more than half the marital estate, the court improperly considered the cost of child care and the amount of time Sabra spent raising the children. We have stated that the list of factors in AS 25.24.160(a)(4) "is not exhaustive" and that it is entirely appropriate for a court to consider factors not enumerated in that statute.[25] The statute did not prevent the court from considering these circumstances. To the extent these circumstances may have been relevant to Sabra's economic "necessities" not otherwise covered by child support payments, it was not inappropriate to consider them.

Taggart also argues that the court should have considered his child-care costs. Because Taggart testified that he had no child-care costs, we are unpersuaded by this argument.

### B. It Was Error To Deduct the $10,000 Loan from Taggart's Portion of the TSP Without a More Detailed Explanation.

■ In mid–2005 the superior court ordered Taggart to borrow $10,000 from his TSP account so he could continue to make mortgage payments on the marital home occupied by Sabra and the children. Although the superior court found the marital portion of the TSP account was worth about $194,000 in July 2005, in its 2006 decision the court attributed the entire $10,000 TSP loan to Taggart, rather than dividing it between the parties. Taggart argues that it was error to treat the loan as his, and that it should have been classified as a marital loan to be divided between the parties.

The May 31, 2006 findings of fact and conclusions of law characterized all mortgage payments, including those made from the TSP loan, as payments made in lieu of child or spousal support.[26] Thus, the superior court found:

> After separation, Taggart agreed (and his agreement subsequently was made into an order) to pay the mortgage on the marital home in lieu of child support. He stopped paying the mortgage on occasions, leaving Sabra in financial difficulties, and Taggart eventually was ordered to take a loan of $10,000 from the TSP to continue to pay mortgage payments in the interim, and to pay for a second appraisal.... The $10,000 loan amount from the TSP shall be counted against Taggart's 33% share of the TSP, because he agreed and was ordered to pay the mortgage from his post-separation income.

The court then added that to the extent the mortgage payments exceeded Taggart's child support obligation, it was "fair and equitable" to deem the excess interim spousal support.

Taggart argues that although "he did originally agree to continue to make the mortgage payment on the marital residence in lieu of child support at the onset of this litigation," by the time he took out the TSP loan, he no longer wished to pay the mortgage in lieu of child support. Instead, beginning in mid–2005 Taggart filed repeated motions asking the court to issue a written decision and to award the home (and the responsibility for making the mortgage payments) to Sabra. Taggart argues that because the court delayed issuing its decision,[27] and because the TSP loan was "utilized to preserve the marital estate," it should have been split between the parties.

Taggart is correct in arguing that the superior court must "consider payments made to maintain marital property from post-separation income when dividing marital proper-

---

24. In her trial brief Sabra argued she had been given an estimate of $18,000 to repair the house for sale. She also argued the repairs would be "obligatory." So far as we can tell, no evidence was offered at trial to support these contentions.

25. *Nicholson v. Wolfe*, 974 P.2d 417, 422 (Alaska 1999).

26. Taggart does not argue that Sabra was not entitled to interim spousal support.

27. Citing AS 22.10.190(b), Taggart implies that the decision was untimely. The court issued its decision on May 31, 2006, within six months of the December 2, 2005 closing arguments, satisfying AS 22.10.190(b).

ty,"[28] even though we have recognized that "[w]e have not ... held that the spouse who makes such payments must necessarily be given credit for them in the final property division."[29] Here it appears Taggart may be correct in arguing that the court entered a separate interim $500 per month child-support order at about the same time the court ordered him to take out the TSP loan to make the mortgage payments. This would seem to be inconsistent with treating the mortgage payments as Taggart's own obligation on the theory they were in lieu of his child support payments. Also, because most of Taggart's TSP account was marital, in effect the loan (although taken out by Taggart) used marital assets to preserve another marital asset (the parties' home) before trial. It therefore would have been appropriate to presume that the loan was marital. Nonetheless, the findings of fact and conclusions of law do not discuss whether the court considered these payments when it divided the property. We remand for more detailed findings explaining why the TSP loan should not be treated as a marital debt to be divided equitably between the parties, rather than counted only against Taggart's share of the TSP.

### C. It Was Error To Overlook Taggart's Interim Child Support Payments.

■ Taggart claims that he testified that he made three child support payments of $500 for August, September, and October, 2005. The findings of fact and conclusions of law did not mention these payments. Taggart argues that he began paying child support "based upon the trial court's oral order entered on July 22, 200[5]." We assume he is referring to the July 21 order requiring that child support be calculated in accor-

dance with Alaska Civil Rule 90.3, beginning August 1. Taggart did not file a Rule 90.3 income affidavit at that time. Nevertheless, in *Ogard v. Ogard*, we held that payments made on behalf of the children were to be credited against interim child support obligations.[30] On remand, the superior court should clarify to what extent, if any, Taggart should receive credit for interim child support payments he made beginning in August 2005.[31]

### D. It Was Error To Require Taggart To Purchase Survivor Benefits Without Determining Their Cost.

■ The superior court ordered the division of Taggart's unvested FERS account by QDRO, awarding sixty-seven percent to Sabra while requiring Taggart to bear the cost of purchasing survivor benefits. Taggart argues that the cost of purchasing the survivor benefits should have been allocated between the parties "in the same proportion as the rest of the marital estate."[32]

We express no opinion about how the cost of survivor benefits should have been divided. But allocating the entire cost to Taggart effectively deviated from the allocation scheme the court stated it was following. Absent a determination (or undisputed evidence) that the cost of the benefits was financially insignificant, Taggart should not have been required to pay the entire cost of purchasing the benefits without determining how much the benefits cost and without considering how imposing that expense on Taggart would affect the property division. As we held in *Lang v. Lang*, we need to know the "ultimate facts" that the property division was based on to determine whether the supe-

---

**28.** *Cf. Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992) (citation omitted) (holding that superior court was not required to give husband credit for post-separation payments that preserved marital estate, but recognizing that it could do so).

**29.** *Id.* In reviewing the division of property, we have held that "the division of property between the parties in a divorce action rests in the discretion of the trial judge, and we should not disturb such division unless clearly unjust." *Merrill v. Merrill*, 368 P.2d 546, 547 (Alaska 1962).

**30.** *Ogard v. Ogard*, 808 P.2d 815, 817 (Alaska 1991).

**31.** Taggart also argues that he was not given credit for his post-November 2005 monthly support payments. He can also pursue that contention on remand.

**32.** In reviewing the superior court's division of property, we will not disturb the division unless it is clearly unjust. *Merrill*, 368 P.2d at 547.

rior court abused its discretion.[33] We therefore remand for determination of the cost of the survivor benefits and, unless the cost is insignificant, for further consideration and explanation of how that cost should be allocated.

### E. Taggart Waived His Argument Pertaining to Leave.

Taggart argues that he should not have to cash out sixty-seven percent of his leave and pay Sabra its value because the superior court did not ascertain whether all of his leave could be cashed out. He contends that the court erred by not determining "if some or all of Taggart's personal leave that was accrued is sick leave that is only available to him for the limited purposes of actual illness or for determining the length of service upon retirement its value is inherently speculative." Because Taggart presented no evidence at trial that any of his leave could not be cashed out, he did not preserve this argument.[34]

### F. The Findings Are Inadequate for the $3,000 Rehabilitative Alimony Award.

Taggart argues that Sabra was not entitled to rehabilitative alimony because she was awarded sixty-seven percent of the marital estate.[35] Sabra sought rehabilitative alimony of $10,000. The court denied that request, but awarded her $3,000. In doing so, the court did not explain how it calculated this amount, or what expenses and for what duration this amount would cover. And it did not explain why an award of this amount was needed, given Sabra's income and given the size of the marital estate, its unequal allocation, and the amount of marital property awarded her. Sabra should not have been awarded $3,000 in rehabilitative alimony absent factual findings about the cost and duration of the projected rehabilitation plan and absent findings that her income and her share of the marital property were insufficient to allow her to pursue a rehabilitation program at her own expense.[36] We therefore vacate this award and remand for further findings. The court, at its discretion, may receive additional relevant evidence.

### G. The Award of Attorney's Fees Was Reasonable.

Taggart argues that Sabra should not have been awarded $5,000 in attorney's fees. He asserts that "[t]here was no finding by the trial court that Sabra's financial condition in any way prohibited her from litigating the divorce action on a fairly equal plane." He also argues that it was inconsistent to award Sabra attorney's fees after the court concluded that she was not entitled to be reimbursed for credit card debt she incurred to pay for attorney's fees and the children's expenses. Taggart also argues that Sabra received a significant award in the form of mortgage payments and the property division.

We will not reverse an award of attorney's fees unless it is "arbitrary, capricious, or manifestly unreasonable."[37] The superior court did not need to make a specific finding that Sabra would be unable to litigate the divorce on "a fairly equal plane." As Taggart recognizes, "cost and fee awards in a divorce action are not to be based on the prevailing party concept, but primarily on the relative economic situations and earning

---

**33.** *Lang v. Lang*, 741 P.2d 1193, 1195 (Alaska 1987) (citing *Merrill*, 368 P.2d at 547–48).

**34.** *Harvey v. Cook*, 172 P.3d 794, 802 (Alaska 2007).

**35.** We review rehabilitative alimony awards for abuse of discretion. *McDougall v. Lumpkin*, 11 P.3d 990, 992 (Alaska 2000).

**36.** *Cf. Brown v. Brown*, 914 P.2d 206, 209 (Alaska 1996); *but see Bays v. Bays*, 807 P.2d 482, 485 (Alaska 1991) (citing *Schanck v. Schanck*, 717 P.2d 1, 5 (Alaska 1986)). In *Bays*, we stated that our preference for meeting the parties' needs with the property division does not apply to "rehabilitative alimony or support of limited duration." 807 P.2d at 485. Here, however, the question is not whether, given the property division, it was an abuse of discretion to award any rehabilitative alimony, but whether there were adequate factual findings to justify the $3,000 award.

**37.** *Schmitz v. Schmitz*, 88 P.3d 1116, 1122 (Alaska 2004).

powers of the parties."[38] Taggart acknowledges that the superior court awarded Sabra $5,000 "[b]ased on the disparity in income between the parties." This was an adequate explanation for this award. We therefore affirm the $5,000 attorney's fees award.

Although Taggart has prevailed on some issues on appeal, in Part III.A we affirmed the unequal property division. The amount in dispute as to the property division very substantially exceeds the total amounts in dispute as to issues on which Taggart prevailed at trial and as to those additional issues on which he may prevail on remand. We therefore decline to remand for reconsideration of the attorney's fees award.

## IV. CONCLUSION

We VACATE as to the treatment of the $10,000 TSP loan as Taggart's, Taggart's claim of credit for interim child support, the cost and allocation of the survivor benefits, and the award of rehabilitative alimony, and REMAND for additional proceedings as to those disputes. We AFFIRM the remainder of the superior court's findings of fact and conclusions of law, including its property division.

BRYNER, Justice, not participating.

---

**38.** *Rodvik v. Rodvik,* 151 P.3d 338, 351 (Alaska 2006) (quoting *Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1192 (Alaska 1987)).