NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SLADE R., | ) |
| | ) Supreme Court No. S-18252 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-19-00594 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1917 – August 31, 2022 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Charles E. Brasington, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Notice of nonparticipation filed by Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Borghesan, and Henderson, Justices. [Carney, Justice, not participating.]

## I.   INTRODUCTION

The Office of Children's Services (OCS) took emergency custody of a young child after she sustained serious injuries while in her mother's care. In the two

---

\*      Entered under Alaska Appellate Rule 214.

years afterward, the child's father moved in and out of jail and the mother left Alaska. OCS petitioned to terminate the father's parental rights. The superior court granted the petition, finding that the child was in need of aid due to abandonment, the father's incarceration, and the father's substance abuse, and that OCS made reasonable efforts to reunite the father with his daughter. The father appeals. Seeing no reversible error, we affirm the termination of his parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Ainsley was born in Anchorage in March 2019 to Slade R. and Brynn S.[1] OCS received a protective services report at Ainsley's birth due to concerns that Brynn was using heroin, but Ainsley tested negative for substances. Three months after Ainsley's birth, Slade was incarcerated.

In October 2019 Brynn brought Ainsley to the emergency room due to head swelling. Brynn told medical professionals there that the swelling had resulted from two or three separate falls. The medical professionals concluded that Ainsley's injuries — including a skull fracture, a bilateral scalp hematoma, a left arm fracture, a subconjunctival hemorrhage, a torn frenulum, scrapes and cuts, and puncture wounds — were severe, inconsistent with Brynn's account, and indicative of nonaccidental trauma. OCS received a second protective services report following these observations.

Shortly after the emergency room visit, OCS took custody of Ainsley and placed her in a foster home. Slade, awaiting the resolution of various criminal charges against him, was still in jail at this time. Slade's mother requested placement, which OCS denied due to concerns about her ability to meet Ainsley's significant medical needs.

---

[1]    We use pseudonyms to protect the parties' privacy.

In November 2019 Ainsley's first foster family returned her to OCS. OCS then placed Ainsley with Delta, a licensed foster parent, and her husband. The placement was intended to be for a short term only, but Delta, in light of Ainsley's significant needs, ended up assuming her long-term care. Ainsley's health problems included dysphagia, silent aspiration, and delayed gastric emptying.

Ainsley's first OCS caseworker met with Brynn and Slade in late 2019 to develop case plans for both parents. Slade's case plan set two goals for him: (1) to "be a productive member of society and be able to care for [Ainsley]"; and (2) to "learn and use parenting skills to properly care for [Ainsley]."

OCS later became aware of the extent of Ainsley's medical needs, which require her to avoid drinking liquids or eating pureed foods, to receive hydration and nutrition from a surgically placed gastrostomy tube (g-tube[2]), and to attend a variety of medical and therapy appointments each week. In light of these needs, the caseworker modified Slade's case plan to require him to (1) "learn and use parenting skills to properly care for [Ainsley]," and (2) "learn what [Ainsley]'s medical and emotional needs are in order to safely care and provide for her." To accomplish the first goal, the case plan instructed Slade to complete parenting and anger management classes; the caseworker made referrals for these classes. To accomplish the second goal, the case plan directed Slade to (1) "continue working with [Delta] to learn [Ainsley]'s needs," (2) "attend [Ainsley's] appointments," and (3) "maintain consistent family contact with [Ainsley]."

---

[2] A g-tube is a feeding tube inserted through an opening into the stomach. *See Gastrostomy*, STEDMAN'S MEDICAL DICTIONARY (2014); *Gastrostomy Tube*, NAT'L CANCER INST., https://www.cancer.gov/publications/dictionaries/cancer-terms/def/gastrostomy-tube (last visited Aug. 2, 2022).

Slade was released from jail in February 2020. He met with the caseworker again the day of his release; the caseworker then set up in-person contact with Ainsley, which began in June. Slade later testified at trial that he visited Ainsley consistently until September 2020. Slade also attended one of Ainsley's appointments in person before COVID-19 pandemic restrictions were imposed. After the onset of the pandemic, many medical providers began allowing only one caretaker to attend appointments in person, which left Slade unable to physically attend Ainsley's appointments. Although Delta arranged for Slade's virtual participation at the appointments, he did not attend any of them. The caseworker followed up with Slade to highlight the need to attend these appointments and to maintain contact with Delta.

In late September a warrant was issued for Slade's arrest; he then stopped visiting Ainsley. OCS sent Slade text messages indicating that the agency would discontinue visits if he kept missing them. Slade ultimately missed a month and a half of scheduled visits. Slade maintained that he missed these visits because he feared being arrested if he appeared for visitation at OCS offices; he explained that he wanted to collect enough bail money to gain release before turning himself in on the warrant. The case was transferred to a second caseworker during this time.

Slade was arrested in November and returned to jail. Slade had no contact with Ainsley or Delta after his arrest. After an eight-day release in early 2021, Slade was again returned to jail.

## B.    Proceedings

OCS petitioned to terminate Brynn and Slade's parental rights in June 2021. OCS alleged that Ainsley was in need of aid based on abandonment,[3] incarceration,[4] physical harm,[5] mental harm,[6] neglect,[7] and parental substance abuse.[8]   A third caseworker took over the case a month after the petition was filed.  Brynn, who had left Alaska for Arkansas, relinquished her parental rights the week before trial.  Slade, who was still incarcerated, proceeded to trial.

A termination trial took place on two days in September.  OCS called Delta and Slade's second and third caseworkers to testify as witnesses, while Slade testified on his own behalf.

Delta's testimony focused on Ainsley's special needs and the type of care Delta provided to meet them.  Delta testified that she took Ainsley to four to six medical and therapy appointments a week.  These appointments included weekly home visits with a developmental support program and periodic appointments with her pediatric gastroenterologist, developmental neurologist, nutritionist, speech therapist, occupational therapist, and pediatrician.  Delta also testified that she fed Ainsley through her g-tube five times a day and gave her medication and water with a syringe four times a day.

---

[3]     AS 47.10.011(1).

[4]     AS 47.10.011(2).

[5]     AS 47.10.011(6).

[6]     AS 47.10.011(8).

[7]     AS 47.10.011(9).

[8]     AS 47.10.011(10).

Delta described the difficulties caused by Ainsley's g-tube: sometimes the tube would "just pop" out of Ainsley's body; if the tube was not quickly replaced, the opening for the tube would start to close. Delta testified that because of this problem, she had to take Ainsley to the emergency room six times. Delta mentioned that she took a special class to learn how to take care of the g-tube.

Delta also testified that she and her family had to restructure their days to ensure that Ainsley could get enough food while avoiding cyclical vomiting, which happens when she is fed too quickly due to her gastric emptying condition. Delta then testified that she must be vigilant to stop Ainsley from eating or drinking anything she cannot safely consume because of her history of silent aspiration.

When asked whether others could learn to meet Ainsley's needs, Delta said yes, but that "dedication[,] . . . patience[,] and willingness to learn" would be essential. She observed that despite having five other children — two of whom also had special needs — Ainsley's care took up seventy percent of her time. Delta testified that she had no special training before Ainsley was placed with her family; she needed to be taught and did not think she would have been able to understand how to take care of Ainsley without the support she received from Ainsley's medical team.

Delta also testified about her communication with Slade. She testified that she arranged for Slade's remote participation and told him to contact her for Ainsley's appointment schedule, but he did not follow through. Delta added that Slade had last contacted her in August or September 2020.

Slade's OCS caseworkers testified next. The second worker to handle his case testified that she worked on case planning with Slade over the phone before he went to jail in November 2020 but did not call him in jail. When questioned about the possibility of family contact during Slade's incarceration, the second caseworker testified that she "was told that . . . family contact was not being allowed by [the Department of

Corrections (DOC)]." The third caseworker testified that she had spoken with Slade once over the phone since receiving the case in July 2021. She added that because the termination trial had already been scheduled when she was assigned the case, her activities consisted mainly of "coordinating" and "getting things in place prior to the [trial]."

Finally, Slade testified about a number of topics, including his participation in his case plan and his incarceration. Slade testified that the first caseworker — with whom he had a good working relationship — had instructed him to get in touch with Delta to coordinate his remote attendance at Ainsley's appointments. Slade admitted that he "was kind of lagging" in this regard, commenting that he had a full-time job and would have preferred being given a schedule to follow.

Slade further testified about his contact with Delta. He testified that he did not contact her from jail because he lost his phone and no longer had Delta's phone number. Slade testified that he asked his mother to call Delta for him while he was incarcerated, but she could not because she had broken her phone and was unable to retrieve Delta's number from Slade's list of contacts, which was stored online. Slade noted that the first caseworker had emphasized the need to maintain contact with Delta.

The superior court made findings on the record at the conclusion of trial and issued a written order that same day. The court terminated Slade's parental rights, finding that Ainsley was a child in need of aid due to abandonment, incarceration, and substance abuse. The court also found that OCS made reasonable efforts considering "the totality of the case," including the first caseworker's "incredibly involved and active" efforts, Slade's failure to work on his case plan, and OCS's limited ability to provide Slade services while he was incarcerated during the COVID-19 pandemic.

Slade appeals the termination order.

## III. DISCUSSION

To terminate parental rights under AS 47.10.088 a court must make three findings by clear and convincing evidence. First the court must find that the child has been subjected to conduct or conditions rendering the child in need of aid.[9] Second the court must find that the parent has failed, within a reasonable time, to remedy the conduct or conditions that placed the child at substantial risk of harm.[10] Third the court must find that OCS made reasonable efforts to reunify the family.[11] The court must also find by a preponderance of the evidence that termination is in the child's best interests.[12] Slade challenges only two findings: (1) that Ainsley was a child in need of aid and (2) that OCS made reasonable efforts toward family reunification.

### A. The Superior Court's Findings Are Sufficient For Informed Appellate Review.

Slade first argues that the superior court's findings impede informed appellate review because they do not clearly articulate the reasons and evidence supporting its termination of his parental rights.[13] To permit informed appellate review in a CINA case, the superior court's "findings need not be extensive," but they must clearly indicate the grounds on which the court found the child to be in need of aid and

---

[9] AS 47.10.088(a)(1); *see also* AS 47.10.011 (listing conduct or conditions that may lead to CINA finding).

[10] AS 47.10.088(a)(2).

[11] AS 47.10.088(a)(3); AS 47.10.086.

[12] CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[13] *See Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) ("Whether there are sufficient findings for informed appellate review is a question of law [reviewed de novo]." (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008))).

the facts supporting the court's findings and conclusions.[14] We conclude that the court's findings permit informed appellate review.

The superior court specified that Ainsley was in need of aid on three grounds; for each of these grounds, the court referenced the facts it relied on. First, it explained that Ainsley was in need of aid based on abandonment due to her "very young" age and testimony that Slade last had contact with her over a year before the hearing.[15] Second, the court explained that Ainsley was in need of aid based on Slade's incarceration because Slade "ha[d] been incarcerated for a majority of the time that [Ainsley] [was] in OCS custody" and he had not made adequate arrangements for her.[16] And third, the court explained that Ainsley was in need of aid based on Slade's substance abuse because Slade intended to enter a year-long substance abuse treatment program.[17]

The superior court's findings also cite facts the court relied on in determining that OCS made reasonable efforts to reunify Slade and Ainsley. The court

---

[14]     *Cf. Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997) (setting out standard for appellate review of custody findings).

[15]     *See* AS 47.10.013(a) ("[T]he court may find abandonment of a child if a parent . . . has shown a conscious disregard of parental responsibilities toward the child by failing to . . . maintain regular contact . . . considering the child's age and need for care by an adult."); AS 47.10.013(a)(3) ("Abandonment of a child also includes instances when the parent or guardian, without justifiable cause, . . . failed for a period of at least six months to maintain regular visitation with the child.").

[16]     *See* AS 47.10.011(2) ("[T]he court may find a child to be a child in need of aid if . . . a parent . . . is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid . . . , and the incarcerated parent has not made adequate arrangements for the child.").

[17]     *See* AS 47.10.011(10) ("[T]he court may find a child to be a child in need of aid if . . . the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child.").

mentioned the "incredibly involved and active" efforts of the first caseworker, Slade's lack of participation in the case plans, the lack of change in the case plans, and complications resulting from Slade's incarceration during the COVID-19 pandemic.

These oral findings are not detailed, to put it mildly.[18] But they give us an indication of the factors that the superior court considered important in exercising its discretion,[19] so they are just barely adequate to permit informed appellate review.

### B. The Superior Court Did Not Clearly Err By Finding That Ainsley Was A Child In Need Of Aid Due To Abandonment.

To terminate parental rights, a court must find by clear and convincing evidence that the child has been subjected to conduct or conditions that caused the child to be in need of aid as described in AS 47.10.011.[20] Slade contests the superior court's finding that Ainsley was a child in need of aid on three statutory grounds: abandonment, incarceration without making adequate arrangements, and substance abuse.

Whether a child is in need of aid is a factual determination reviewed for clear error.[21] "Findings of fact are clearly erroneous if a review of the entire record in

---

[18] *See Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 266 (Alaska 2019) ("[W]e remind superior courts that findings must be sufficient to support meaningful appellate review."); *In re Adoption of Hannah L.*, 390 P.3d 1153, 1157 n.16 (Alask 2017) ("[T]he superior court must provide findings sufficient to give a clear understanding of the grounds upon which it reached its decision." (quoting *Price v. Eastham*, 128 P.3d 725, 727 (Alaska 2006))).

[19] *See Borchgrevink*, 941 P.2d at 139 ("A [superior] court's factual findings . . . must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved.").

[20] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[21] *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*,
(continued...)

the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[22] Only one statutory ground is needed to sustain a CINA finding.[23] We affirm because the superior court did not clearly err by finding that Ainsley was a child in need of aid due to abandonment.[24]

A court may find a child in need of aid if "a parent . . . has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid."[25] Slade does not dispute that Brynn was absent,[26] focusing only on the superior court's finding

---

[21] (...continued)
310 P.3d 943, 948-49 (Alaska 2013).

[22] *Id.* at 949 (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 269-70 (Alaska 2011)).

[23] *Duke S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1127, 1132 (Alaska 2018) ("A finding of CINA status under just one statutory subsection is enough to support termination.").

[24] Although we need not address the other two grounds for finding Ainsley to be a child in need of aid, we note that the superior court's substance abuse finding appears to lack any evidentiary basis whatsoever. The few references at trial to Slade's substance abuse were either oblique or vague: Slade brought up a substance abuse treatment program he had been negotiating entry into, and the second caseworker mentioned "safety concerns of substance abuse by [Ainsley's] parents." This testimony is woefully short of clear and convincing evidence establishing that Slade's ability to parent had been "substantially impaired by the addictive or habitual use of an intoxicant" and that such use had "resulted in a substantial risk of harm" to Ainsley. *See* AS 47.10.011(10); *cf. Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1258-59 (Alaska 2010) (affirming CINA finding based in part on evidence of mother's "substantial" and detailed history of drug use).

[25] AS 47.10.011(1).

[26] Brynn had moved to Arkansas and signed a relinquishment of her parental
(continued...)

that he abandoned Ainsley. The court based its finding on AS 47.10.013(a), which defines abandonment as "a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."

Slade argues that he consistently "demonstrated a desire and willingness to parent Ainsley."[27] But his own testimony shows that he voluntarily failed to contact Ainsley for a lengthy period of time. Slade testified that he missed all scheduled visits after September 28, 2020, because a warrant had been issued for his arrest. He conceded that OCS sent him text messages during that time to remind him about visitation and to warn him that visits would be discontinued if he kept missing them. Despite these warnings, Slade missed the visits. Slade then admitted that after his November 13 arrest he did not contact Delta in order to communicate with Ainsley, who was then just over eighteen months old. Even after he was released from jail in April 2021, he did not contact Delta or Ainsley. Based on this evidence, it is clear that Slade did not maintain regular contact with his child, who had significant attachment issues and medical needs.

---

[26]     (...continued)
rights before Slade's hearing.

[27]     Slade appears to argue that we must use the two-part common-law abandonment test in reviewing the court's finding. This test requires a showing of "(1) . . . parental conduct evidencing a willful disregard for parental obligations, leading to (2) the destruction of the parent-child relationship." *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 775 (Alaska 2012) (quoting *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 335 (Alaska 2011)). We have rejected the notion that the superior court must find that a parent's conduct satisfies the common-law test when it has already found that the conduct meets the statutory criteria for abandonment. *Steve H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 109, 113 (Alaska 2019).

Slade maintains that external factors — including his incarceration and OCS's failure to arrange visitation for him after he returned to jail — are to blame for his lack of contact with Ainsley. Slade testified that he had not called Delta since his arrest because he lost his phone and, with it, Delta's phone number. He explained that he had asked his mother to contact Delta for him while he was incarcerated, but that she was unable to because she had broken her phone and could not access his contacts online. But Slade's explanation, even if true,[28] does not account for his failure to retrieve Delta's number during his eight-day release in early 2021 and his subsequent lack of contact with her or Ainsley.

Slade points out that OCS did not call him in jail after he arrived there in November 2020 until a month or two before the September 2021 termination trial. Although OCS's inaction is troubling, it does not change the fact that Slade himself did not initiate any contact with Ainsley during this time, including during his eight-day release. Incarceration surely made communication more difficult, but Slade is responsible for not taking the opportunities available to him — both in and out of jail — to reestablish contact with Ainsley. In light of his inaction, we cannot say it was clear error to find that Slade displayed a conscious disregard of his parental responsibilities by failing to maintain regular contact with Ainsley. We therefore affirm the court's finding that Ainsley was a child in need of aid.

---

[28] *See Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1239 (Alaska 2015) (stating that record is construed "in the light most favorable to the prevailing party" in clear error review (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 849 (Alaska 2014))).

**C.** **The Superior Court Did Not Err By Finding That OCS Made Reasonable Efforts To Reunify The Family.**

The superior court may not terminate parental rights unless it finds by clear and convincing evidence that OCS made reasonable efforts to reunify the family.[29] Reasonable efforts must involve " '(1) identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid' and '(2) actively offer[ing] the parent . . . and refer[ring] the parent' to these services."[30] "In reviewing whether OCS made reasonable efforts, a court considers . . . reunification efforts in their entirety"[31] and whether the efforts "were reasonable in light of the surrounding circumstances."[32] A parent's incarceration is a relevant circumstance that affects "the scope of OCS's duty to make reasonable efforts."[33] In addition, "reasonable efforts should be 'reasonably calibrated to the interest in parenting demonstrated by' the parent."[34]

---

[29] AS 47.10.088(a)(3); *see also* AS 47.10.086 (describing scope of reasonable efforts).

[30] *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1164-65 (Alaska 2016) (alterations in original) (quoting AS 47.10.086(a)(1)-(2)).

[31] *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

[32] *Id.*

[33] *Id.*

[34] *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 347 (Alaska 2006) (quoting *Jeff A.C., Jr. v. State*, 117 P.3d 697, 707 (Alaska 2005)). We recently held in *Mona J. v. State, Department of Health and Social Services, Office of Children's Services* that a parent's unwillingness to engage with OCS does not excuse OCS from continuing to make active efforts in an ICWA case, although

(continued...)

The superior court found that OCS's efforts were reasonable over the life of the case, noting that by Slade's own account, his first caseworker had been "incredibly involved and active" and had offered "whatever services he could." The court pointed out that aside from attending one day of Ainsley's medical appointments, Slade had not "meaningfully participated" in the case plan, which directed him to work with Delta to learn the care Ainsley needed. The court further noted that OCS's ability to provide Slade services had been limited by his incarceration, the COVID-19 pandemic, and DOC rules regarding family contact during the pandemic.

Slade challenges the finding that he was not committed to participating in his case plan, arguing that there was "no evidence that [he] had refused to work with OCS."[35] But the evidence shows that Slade did not make progress toward achieving the case plan's goal of learning Ainsley's medical and emotional needs. The case plan identified three specific activities Slade needed to undertake to accomplish this goal: (1) maintain consistent family contact with Ainsley; (2) continue working with Delta; and (3) attend Ainsley's appointments. Although Slade regularly visited Ainsley for several months during his first stint out of jail, he ceased contact with Ainsley and Delta entirely after becoming aware of a warrant issued for his arrest. Furthermore, Slade attended only one of Ainsley's medical appointments. Slade testified that his first

---

[34]     (...continued)
the parent's resistance can affect the determination of what active efforts entails. 511 P.3d 553, 562-65 (Alaska 2022). *Mona J.* did not address OCS's duty to make reasonable efforts in non-ICWA cases; we therefore analyze OCS's efforts in this case using only the framework described above.

[35]     *See Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273-74 (Alaska 2014) ("Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact. When reviewing mixed questions of law and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment." (footnotes omitted)).

caseworker instructed him to engage with Delta to coordinate his remote participation at these appointments after COVID-19 restrictions left him unable to attend in person, but Slade admitted that he did not do so. Delta testified that despite arranging for Slade's remote participation and directing him to contact her for Ainsley's appointment schedule, he did not follow through. Given this evidence, it was not clear error to find that Slade had not meaningfully participated in his case plan.

Slade next contends that OCS's efforts were not reasonable because OCS "failed to work with [him]" for half of the approximately two-year-long case. This argument glosses over the first caseworker's efforts and turns a blind eye to Slade's failure to follow his case plan. Whether OCS has made reasonable efforts "must be evaluated in light of the circumstances of each particular case, including the parent's actions or inaction[, and] 'must be viewed in light of the entire history of services that the [S]tate had already provided.' "[36] OCS made considerable efforts at the beginning of the case to help Slade and Brynn reunify with Ainsley, providing phone numbers and referrals to both parents for providers that could help them work their case plans. Slade's case plan was straightforward, requiring him to learn parenting skills and to learn Ainsley's medical and emotional needs.[37] The activities Slade was instructed to engage in to attain these goals — including attending Ainsley's medical and therapy appointments and working with Delta to learn Ainsley's needs — were reasonable. The

---

[36] *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008) (quoting *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 66 P.3d 1, 7-8 (Alaska 2003)).

[37] Slade's case plan remained relatively unchanged throughout the case. Slade suggests that repetition in updated iterations of his case plan shows that OCS did not attempt to reunify him with Ainsley. But because Slade was not making headway toward completing the case plan's feasible goals, we cannot say OCS's decision to keep the same goals was unreasonable.

first caseworker followed up with Slade after his initial release from jail to emphasize the importance of attending these appointments and staying in contact with Delta. Despite these efforts, Slade did not attend Ainsley's appointments.

Slade takes issue with the lack of visits offered after he went back to jail and highlights the fact that his second and third caseworkers each called him only once during their respective tenures. But after Slade returned to jail in November 2020, there was little that OCS could do on his behalf. OCS could not help arrange for visitation because DOC was not offering in-person family visits due to the pandemic.[38] Because Ainsley was so young and had a significant speech delay, telephonic visitation was unlikely to be meaningful. Furthermore, Slade would not have been able to attend Ainsley's frequent medical appointments in person from the confines of jail. Although the record does not show whether Slade might have been able to attend some of these appointments virtually from jail, he failed to attend a single appointment virtually even when that option was available to him before going to jail. OCS was remiss in failing to call Slade for the first ten months of his incarceration. Yet OCS's efforts, considered in their entirety, "must be reasonable but need not be perfect."[39] In light of OCS's ample

---

[38]    *See Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 647 (Alaska 2013) ("[T]he practical circumstances surrounding a parent's incarceration — the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration — may have a direct bearing on what active remedial efforts are possible." (quoting *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999))); *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 268-69 (Alaska 2019) (holding that determination of reasonable efforts must be assessed in light of circumstances of the case).

[39]    *Emma D. v . State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 850 (Alaska 2014) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012)).

efforts at reunification before Slade went to jail in November 2020, and Slade's failure throughout the life of the case to take the steps necessary to become a safe parent for his medically fragile daughter, we conclude that the superior court did not err by determining that OCS made reasonable efforts to reunify Slade and Ainsley.

## IV.   CONCLUSION

We AFFIRM the superior court's order terminating Slade's parental rights.