Annette J. BEAL, Appellant/Cross–
Appellee,

v.

David D. BEAL, Appellee/Cross–
Appellant.

Nos. S–12811, S–12831.

Supreme Court of Alaska.

June 12, 2009.

Justin Eschbacher and G.R. Eschbacher, Law Offices of G.R. Eschbacher, Anchorage, for Appellant and Cross–Appellee.

Jimmy E. White, Hughes Pfiffner Gorski Seedorf & Odsen, LLC, Anchorage, for Appellee and Cross–Appellant.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

This is the second time this divorce case has come before us. David and Annette Beal each appeal several of the superior court's rulings on remand following our decision in *Beal v. Beal (Beal I)*.[1] David appeals the superior court's educational support order requiring him to pay for Annette's attendance at Johnson & Wales University. Because the latest educational support order conforms to the original educational support order, which David did not appeal, we affirm it. David also appeals the superior court's refusal to grant him an "equitable adjustment" to the post-judgment interest he owes. Because David never appealed the post-judgment interest rate, we affirm the superior court's refusal to make the requested adjustment. Annette appeals the superior court's revaluation of the appreciation of David's pre-marital artwork. Because the superior court exceeded the scope of our remand in *Beal I* by revaluing the appreciation, we reverse the revaluation and instruct the superior court to use the original valuation. Annette also appeals the superior court's recalculation of the interim support judgment against David so as to give him $12,918.86 in credit for certain past payments to the Child Support Enforcement Division made prior to the entry of the judgment. Because the issue whether David was entitled to credit for these payments should have been raised in *Beal I*, we reverse this $12,918.86 credit. Finally, Annette appeals the superior court's treatment of a $56,017 credit for mortgage principal reduction caused by David's post-separation mortgage payments and the superior court's decision to grant David another $10,869.68 mortgage credit. Because the superior court acted within its broad discretion in fashioning an equitable property division

when it awarded David these two credits, we affirm them.

## II. FACTS AND PROCEEDINGS

Annette and David Beal were married in 1985 after signing a prenuptial agreement.[2] David was a successful ear, nose, and throat doctor. Annette and David have two children together, both of whom are now adults.

Annette filed for divorce in July 1999. This case was originally assigned to Superior Court Judge Rene J. Gonzalez, who issued an interim support order in October 1999 mandating that David pay monthly child and spousal support to Annette. The order also provided that during the pendency of the divorce Annette would reside in the family home and David would pay the mortgage on it. In January 2000 Judge Gonzalez found that David had not complied with this order and issued a judgment against him in favor of Annette for $64,722.99. Annette satisfied this judgment by executing against various forms of David's property.

A trial was held in August 2000, and Judge Gonzalez issued a property division order on March 7, 2001, making findings covering a wide range of issues. The parties' marital property was divided 55/45 in favor of Annette. The family home was awarded to Annette, who sold it in March 2001.

In April 2001 Judge Gonzalez found that David had again fallen behind on his obligations under the October 1999 interim support order and issued a $230,034.32 judgment against David for unpaid interim support, including unpaid mortgage payments on the family home. Rather than paying the judgment, David deposited a $220,000 supersedeas bond with the clerk of court in May 2001. Further motions regarding David's unpaid support obligations were filed later in 2001.

In their first appeal before us, both parties appealed numerous issues regarding the property division, the April 2001 interim support judgment, and the superior court's decisions on later motions. Their appeals were consolidated, and in a 2004 opinion (*Beal I*),

---

1. 88 P.3d 104 (Alaska 2004).

2. Some portions of the facts and proceedings are taken from our first decision in this matter. *See generally id.* at 108–10.

we affirmed many aspects of the superior court's decision, remanded some to the superior court, and reversed others. David petitioned for a rehearing regarding the specific issue of the appreciation of his pre-marital artwork, and his petition was denied.

Because Judge Gonzalez had retired, this case was dealt with on remand from 2004 to 2007 by Superior Court Judge William F. Morse, who held hearings and issued, among other things, two sets of findings of fact, an order containing further findings, and final judgments. Judge Morse's findings covered a range of issues, not limited to the topics remanded by this court in *Beal I*.

Annette now appeals four of Judge Morse's rulings on remand, and David cross-appeals two.

## III. STANDARDS OF REVIEW

■ David claims that the superior court's most recent educational support order was erroneous. As David points out, educational support for Annette is a substitute for alimony in this case, and we review alimony awards for abuse of discretion,[3] setting them aside only if they are "unjust or unnecessary."[4]

■ David also argues that the superior court erred in not granting him an "equitable adjustment" to the interest on the interim support judgment against him. We apply an abuse of discretion standard to the superior court's use of its equitable power.[5]

■ Annette claims that the superior court exceeded its authority on remand in several respects. "Whether a lower court on remand has correctly applied our mandate is a question of law which we review de novo."[6]

■ Annette also argues that the superior court erred in the manner in which it awarded credit to David for certain mortgage payments on the parties' home during the pendency of the divorce. "We review for abuse of discretion a superior court's decision whether to give a credit to a spouse for payments made to maintain marital property, such as the family home."[7]

## IV. DISCUSSION

### A. The Law of the Case Doctrine

■ "Successive appeals should narrow the issues in a case, not expand them."[8] This is the second appeal in this case. In *Beal I* we addressed "in excess of twenty issues" surrounding the Beals' divorce and property division.[9] Several of the issues currently before us were addressed, or could have been addressed, in *Beal I*. Our perspective on those issues is thus heavily influenced by the "law of the case" doctrine.

■■ The law of the case doctrine, which is "grounded in the principle of stare decisis"[10] and "akin to the doctrine of res judicata,"[11] generally "prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case."[12] Previous decisions on such issues—even questionable decisions[13]—become the "law of the

3. *Hooper v. Hooper*, 188 P.3d 681, 691 n. 35 (Alaska 2008).

4. *Broadribb v. Broadribb*, 956 P.2d 1222, 1226 (Alaska 1998) (quoting *Richmond v. Richmond*, 779 P.2d 1211, 1215 (Alaska 1989)).

5. *Carroll v. Carroll*, 903 P.2d 579, 582 n. 7 (Alaska 1995).

6. *Williams v. Crawford ex rel. Estate of McVey*, 47 P.3d 1077, 1079 (Alaska 2002).

7. *Berry v. Berry*, 978 P.2d 93, 95 (Alaska 1999).

8. *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 873–74 (Alaska 2003).

9. 88 P.3d 104, 108 (Alaska 2004).

10. *Alaska R.R. Corp. v. Native Vill. of Eklutna*, 142 P.3d 1192, 1201 (Alaska 2006).

11. *Carlson*, 65 P.3d at 859 n. 52 (quoting *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (Alaska 1977)); *see also* 47 Am.Jur.2d *Judgments* § 469 (2006).

12. *Carlson*, 65 P.3d at 859 n. 52 (quoting *Wolff*, 560 P.2d at 763).

13. *See, e.g., Austin v. Fulton Ins. Co.*, 498 P.2d 702, 704 (Alaska 1972) (recognizing that insured was barred from proceeding against insurance agent due to an erroneous ruling that had become the law of the case when not disputed on a prior appeal); *see also* E.H. Schopler, Annotation, *Erroneous Decision as Law of the Case on Subsequent Appellate Review*, 87 A.L.R.2d 271 (1963).

case" and should not be reconsidered on remand or in a subsequent appeal except "where there exist 'exceptional circumstances' presenting a 'clear error constituting a manifest injustice.' " [14]

■ The law of the case doctrine applies not only to issues explicitly addressed and decided in a prior appeal but also to issues "directly involved with or 'necessarily inhering' " in a prior appellate decision [15] as well as issues that *could have been* part of a prior appeal but were not.[16] That is, when a party appeals some aspects of a trial court decision but not others, the trial court's rulings on the non-appealed issues may become the law of the case following the appellate decision.

■ The law of the case doctrine is "a doctrine of economy and of obedience to the judicial hierarchy." [17] The strong policy reasons behind it include "(1) avoidance of indefinite litigations; (2) consistency of results in [the] same litigation; (3) essential fairness between the parties; and (4) judicial efficiency." [18] As we have noted, "[j]udicial economy and the parties' interests in the finality of judgments are in no way furthered if parties are allowed to engage in piecemeal appeals." [19]

■ Thus, in evaluating this second set of appeals we accept as the law of this case our decision in *Beal I* as well as the many rulings made by Judge Gonzalez prior to *Beal I* that *could have been* appealed in *Beal I* but were

not. A trial judge who succeeds a prior trial judge in a case while the case is still in the trial court may generally reconsider a decision made by the prior judge without violating the law of the case doctrine.[20] But that freedom is not available where, as here, the prior judge's decision has been affirmed on appeal.

**B. The Superior Court Did Not Err in Requiring David To Pay for Annette's Attendance at Johnson & Wales University Because the Original Educational Support Order Was Affirmed on Appeal in *Beal I*.**

The parties' 1985 prenuptial agreement provided that in lieu of alimony David would pay for Annette's "tuition, books, and all other expenses at a law school of her choice" as well as "reasonable support during the period in which she is enrolled at a law school of her choice." Annette decided not to pursue a legal career and instead, around the time of the divorce, made plans to attend a year of preparatory classes at the University of Alaska in Anchorage (UAA) followed by a two-year master of business administration (MBA) program at the University of Washington (UW). In March 2001 Judge Gonzalez found that "Annette's decision to pursue an MBA program instead of attending law school is reasonable and substantially meets the conditions of the parties' agreement" and that $131,000 from David would be sufficient to allow her to complete her MBA. David

14. *Carlson*, 65 P.3d at 859 (footnotes omitted) (quoting *Patrick v. Sedwick*, 413 P.2d 169, 173–74 (Alaska 1966); *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 583 (Alaska 1989)).

15. *Id.* at 859 n. 52 (quoting *Wolff*, 560 P.2d at 763).

16. *See id.* at 873–74 (declining to address an issue that could have been raised in previous appeals of the same case but was not); *Dunlap v. Dunlap*, 131 P.3d 471, 475–76 (Alaska 2006) ("Although our doctrine of law of the case generally refers to issues that have previously been reviewed at the *appellate* level, the doctrine is equally applicable to issues that have been fully litigated in the superior court and as to which no timely appeal has been made.").

17. *Dieringer v. Martin*, 187 P.3d 468, 473–74 (Alaska 2008).

18. *Petrolane Inc. v. Robles*, 154 P.3d 1014, 1026 (Alaska 2007) (internal quotation marks omitted) (affirming lower court's decision to treat first jury's negligence findings, which had been affirmed in a prior appeal, as conclusive under the law of the case doctrine).

19. *Carlson*, 65 P.3d at 874 (alteration in original and internal quotation marks omitted).

20. *See Bylers Alaska Wilderness Adventures, Inc. v. City of Kodiak*, 197 P.3d 199, 206 (Alaska 2008) ("[W]hen one superior court judge makes a ruling, that superior court judge is succeeded by another superior court judge on the same case, and the subsequent judge declines to follow a previous order from the prior judge[,] we have held that the [law of the case] doctrine does not apply.").

did not appeal this educational support order, but Annette did. In *Beal I* we addressed and affirmed the trial court's order, rejecting Annette's contentions that it did not provide sufficient support and that she should not have been forced to prove full-time enrollment in order to enforce it.[21] Once affirmed on appeal in *Beal I*, the superior court's educational support order, which required David to fund Annette's pursuit of an MBA, became part of the law of this case.

After *Beal I* was decided, David paid $14,555.52 in educational support to Annette while she was enrolled at UAA for one semester. David stopped making payments to Annette when she discontinued her enrollment and decided not to pursue the planned program at UAA and UW. In 2007 Annette moved to enforce Judge Gonzalez's educational support order following her decision to enroll in a different MBA program at Johnson & Wales University in Rhode Island.[22] After holding a hearing, Judge Morse granted Annette's motion to enforce Judge Gonzalez's 2001 educational support order, rejecting David's request that his educational support obligation be terminated but reducing the amount of his remaining obligation to $83,642 due to the lower cost of the Johnson & Wales program.[23]

David now appeals, arguing that Judge Morse's 2007 order is inconsistent with the parties' prenuptial agreement and with Judge Gonzalez's 2001 order, which it purports to enforce. David further argues that Judge Morse's order is inappropriate because he is financially unable to provide the required support. Because Judge Morse's order is consistent with Judge Gonzalez's

educational support order, which became the law of this case following *Beal I*, we affirm it.

■ David asserts that Judge Gonzalez's educational support order "selectively modified" and "altered" the parties' 1985 prenuptial agreement and "extended" Annette's rights under the agreement to include support for an MBA program rather than law school. But Judge Gonzalez's conclusion that three years of schooling in pursuit of an MBA was an acceptable substitute for law school under the prenuptial agreement—which David did not appeal—was affirmed in *Beal I*.[24] We thus decline to question it.

■ David also argues that he is financially unable to pay for Annette's education. But Judge Gonzalez's order requiring David to pay $131,000 for Annette's education—which David did not appeal—was affirmed in *Beal I*.[25] And Judge Morse, in enforcing that order, actually *reduced* the amount owed by David due to the lower cost of the Johnson & Wales program. Whether David's financial situation has deteriorated since Judge Gonzalez entered his 2001 order is irrelevant[26]—that order became the law of this case following *Beal I*.[27]

■ David's sole remaining contention is that Judge Gonzalez's 2001 educational support order was specifically contingent on Annette's attendance at UAA and UW, to the exclusion of other potential MBA options like the Johnson & Wales program. But such a rigid interpretation of Judge Gonzalez's order is not appropriate. In his order, Judge Gonzalez stated as follows:

> Under the parties' agreement, David agreed to provide for post-divorce support for Annette to continue her education. . . .

**21.** 88 P.3d 104, 120–21 (Alaska 2004).

**22.** Though David characterizes the Johnson & Wales program as a "hotel management" program, the record shows that Annette was pursuing an MBA in Hospitality with a concentration in Finance.

**23.** In calculating the $83,642 figure David was given credit for having already paid for Annette's semester at UAA, such that his remaining obligation was for two and one-half years of school (at the reduced Johnson & Wales tuition rate) rather than three.

**24.** 88 P.3d at 120–21.

**25.** *Id.*

**26.** Though we note that Judge Morse specifically found that David is able to pay, having an income of "roughly $100,000" and "significant assets, or at least a mix of assets" with which to fund Annette's education. David has offered no argument as to why these findings were erroneous.

**27.** *See supra* subpart IV.A.

The agreement provides that David shall pay Annette's tuition, books, related expenses and to provide reasonable support while attending school. Annette has decided not to pursue a legal career but instead has decided to pursue a Master's Degree in Business Administration at the University of Washington.... The court finds that Annette's decision to pursue an MBA program instead of attending law school is reasonable and substantially meets the conditions of the parties' agreement. The main area of disagreement between the parties is the amount of "reasonable support" that David is required to provide while Annette is attending three years of university study.

Though Judge Gonzalez based his $131,000 support figure on the tuition at UAA and for the MBA program at UW, he used no language that would suggest that this support would be contingent on Annette's attendance at those specific schools. Accordingly, we affirm the superior court's 2007 order requiring David to fund Annette's pursuit of an MBA at Johnson & Wales.

### C. The Superior Court Did Not Err in Refusing To Make Equitable Adjustments to the Interest Rate on the Judgment Against David Because the Interest Rate Was Affirmed in *Beal I.*

In April 2001 Judge Gonzalez entered judgment against David in the amount of $230,034.32, a total that included unpaid mortgage payments, property tax, insurance, spousal support, and child support under the October 1999 interim support order, plus accrued interest. Judge Gonzalez provided that this judgment would bear interest at a rate of 8.5% until paid in full. Rather than paying the judgment, David deposited a $220,000 supersedeas bond with the clerk of court, who placed the funds in an interest-bearing account at First National Bank of

Alaska. After *Beal I* the bond funds were paid out, mostly to Annette, in July and December 2004.

David did not challenge the interest rate applied to the interim support judgment at any point prior to *Beal I*, nor did he challenge it on appeal in *Beal I*.[28] David's first challenge to the interest rate appears to have been on remand in February 2007 when he filed a "Motion and Memorandum for Equitable Adjustment of Interest Regarding Cash Supersedeas Bond Funds." Judge Morse refused David's request for an "equitable adjustment" to the interest he owed, addressing the merits of David's arguments but nonetheless concluding that "[e]quity does not require the adjustment."

■ David appeals, renewing the arguments he made before Judge Morse. His first argument is that different interest rates should have been applied to the interim spousal and child support judgments to account for a statutory 6% cap on interest for overdue child support payments. His second argument is that because the actual amount of interest earned on the supersedeas bond funds while they were under the control of the clerk of court was much less than 8.5%, it would be inequitable to make him pay 8.5% interest. But because David did not appeal it, the interest rate applicable to the interim support judgment became part of the law of this case following *Beal I*.[29] Accordingly, we decline to address the merits of David's arguments as to why the interest rate was inappropriate.[30]

■ David contends that "divorce proceedings are supposed to be equitable proceedings in which the court has considerable discretion to take equity into account." But while the superior court does have broad equitable powers when fashioning property divisions in divorce cases,[31] the interest owing on the interim support judgment against

---

**28.** *See* 88 P.3d at 110 (listing parties' cross-appeals).

**29.** *See supra* subpart IV.A.

**30.** We note, however, that David could have avoided incurring much of the interest he now

owes had he simply paid the judgment rather than depositing a supersedeas bond.

**31.** *Conner v. Conner*, 68 P.3d 1232, 1234 (Alaska 2003) ("The trial court has broad discretion to make a property division in the manner it determines to be most equitable....").

David is not an aspect of the parties' property division. And as Annette points out, if the superior court were required to seriously consider all procedurally barred arguments raised under the rubric of "equitable adjustment" to a party's obligation under a judgment, achieving finality in this kind of case would be nearly impossible. Accordingly, we affirm the superior court's refusal to make an "equitable adjustment" to the interest owed by David.

### D. The Superior Court Exceeded Its Authority on Remand by Using an Appreciation Value for David's Pre–Marital Artwork that We Rejected in *Beal I.*

Judge Gonzalez found that David's pre-marital artwork had appreciated $63,788 during the marriage, but he did not treat that sum as a marital asset when fashioning the property division despite a term in the parties' prenuptial agreement providing that the appreciation during the marriage of separate pre-marital property would be considered a marital asset. In *Beal I* Annette appealed Judge Gonzalez's failure to include the $63,788 appreciation in the property division in accordance with the prenuptial agreement.[32] David did not cross-appeal Judge Gonzalez's valuation of the appreciation at $63,788 but instead contended that Judge Gonzalez properly did not include the appreciation in the property division because he actually agreed with David that the appreciation was only $1,200,[33] which David characterized as "de minimis" in the context of this case.[34] We specifically rejected this argument, stating:

> David suggests the superior court failed to include the appreciation in its division of the marital estate because it implicitly

agreed with his earlier claim that the appraisal was incorrect, and the true amount of appreciation was "de minimis." This assertion is unsupported in the record.[35]

Based on the prenuptial agreement, we reversed the superior court's failure to treat the "significant appreciation" of David's pre-marital artwork as a marital asset.[36] Following the *Beal I* decision David filed a petition for rehearing, reviving his argument that the appreciation of his pre-marital artwork was only $1,200 and thus was properly excluded from the property division as "de minimis." We denied this petition. Thus, following *Beal I* Judge Gonzalez's $63,788 valuation of the appreciation of David's pre-marital artwork—subject to question or not—became final under the law of the case doctrine because David did not directly appeal it in *Beal I,* and to the extent that he did raise it on appeal, he lost.[37]

Nonetheless, on remand Judge Morse revisited the valuation issue, finding it "difficult to understand how Judge Gonzalez derived the amount of appreciation as $63,788" and interpreting our remand "to permit [him] to correct errors that Judge Gonzalez made in calculating" the amount of appreciation. Judge Morse then found, based on the same record that was before Judge Gonzalez and before us in *Beal I,* that "the only credible evidence of appreciation is for a net value of $1200." He treated that smaller appreciation value, rather than the $63,788 found by Judge Gonzalez, as a marital asset, awarding 55% ($660) of it to Annette. Annette appeals, arguing that Judge Morse exceeded his authority by revisiting the valuation issue on remand. We agree.

Judge Morse's decision to reject the $63,788 valuation and instead use the $1,200

---

32. 88 P.3d at 118–19.

33. Before *Beal I* the parties filed cross-motions for reconsideration regarding the property division. Annette's motion challenged Judge Gonzalez's failure to include the purported $63,788 artwork appreciation in the property division. David opposed Annette's motion, arguing that the true amount of the appreciation was only $1,200. Judge Gonzalez denied Annette's motion but did not elaborate on his reasoning. In *Beal I* David theorized that Judge Gonzalez must have denied Annette's motion based on his ac-

ceptance of David's argument that the $63,788 figure was in error and that the true appreciation was insignificant.

34. *Beal I,* 88 P.3d at 119.

35. *Id.*

36. *Id.*

37. *See supra* subpart IV.A.

figure advanced by David in *Beal I* based on the same analysis of the evidence advanced by David in *Beal I* is inconsistent with *Beal I* and violates the law of the case doctrine. We therefore reverse it. On remand the superior court should account for the appreciation of David's pre-marital artwork in the property division using Judge Gonzalez's original $63,788 valuation.

### E. The Superior Court Exceeded Its Authority on Remand when It Recalculated the Interim Support Judgment To Account for $12,918.86 in Payments Made Prior to the Entry of the Judgment Because the Judgment Was Affirmed in *Beal I.*

In April 2001 Judge Gonzalez found that David had fallen behind on his obligations under the October 1999 interim support order and issued a judgment against him in favor of Annette for $230,034.32. David's various challenges to this judgment were part of *Beal I*. In disposing of David's arguments that the judgment was inflated, we stated:

> David claims that the superior court's judgment for unpaid interim support is overstated because the superior court did not credit him for a number of payments made either to or for Annette and because it ordered him to make payments that were Annette's responsibility. With one exception, we reject these claims.[38]

Accordingly, following *Beal I* the amount of the April 2001 interim support judgment should have been essentially a settled issue under the law of the case doctrine because any claims David may have had that the basic judgment amount was incorrect either

were raised or could have been raised during *Beal I*.[39]

Nonetheless, on remand the superior court appears to have recalculated the April 2001 interim support judgment to factor in support payments David made through the Child Support Enforcement Division (CSED) that should have been, but were not, factored into the original judgment. Annette asserts that David was awarded an additional $12,918.86 in credit for such payments. David does not deny that he was awarded this additional credit.

The superior court interpreted *Beal I* not to preclude a re-accounting of David's past CSED payments, stating that "[t]he supreme court did not address the total amount that David should be credited for payments to CSED."[40] In response to Annette's objections that "[t]he judgment is what it is and should only be reduced pursuant to credits allowed by the Alaska Supreme Court," the superior court remarked:

> The [superior court's] authority to resolve questions of credits toward the [interim support judgments against David] is not limited merely to the topics of the remand.... If the supreme court addressed a particular claim on appeal, then its holding will govern. But if the supreme court did not address a claim for a credit, then this Court will rule on the claim.

But any claims that the interim support judgment did not factor in payments David made to CSED before the judgment's entry either were[41] or *could have been* dealt with in *Beal I*.[42] Thus, absent a showing of "exceptional circumstances presenting a clear

---

**38.** *Beal I*, 88 P.3d at 113. The "one exception" was our conclusion that the interim support judgment should have counted half of the cost of the appraisal of David's medical practice as a support payment to Annette because David had paid for it and it was a cost that the parties were supposed to share. *Id.* at 115.

**39.** *See supra* subpart IV.A.

**40.** One of David's rejected claims in *Beal I* was that a CSED adjustment worksheet used in calculating the interim support judgment "reflect[ed] no payments by David for child support or spousal support prior to September 13, 2000,"

and that therefore the judgment amount was inflated. This argument appears to have been based on a simple misunderstanding of the adjustment worksheet. David corrected this misunderstanding in his reply brief by abandoning this portion of his argument. We nonetheless ruled on the issue, concluding that David had "failed to demonstrate that the superior court did not credit him for the payments made in April and May 2000." *Beal I*, 88 P.3d at 115.

**41.** *See supra* note 40.

**42.** *See supra* subpart IV.A.

error constituting a manifest injustice" [43] sufficient to overcome the law of this case, the superior court should not have revisited the calculation of the interim support judgment other than as specifically instructed in *Beal I.* While David may believe that the judgment included mistakes that were not discovered until after remand, any such mistakes could have been discovered in 2001 and raised in *Beal I.* "Successive appeals should narrow the issues in a case, not expand them." [44] Accordingly, because the $12,918.86 credit that Annette complains of appears to reflect payments by David that should have been, but were not, accounted for in the original April 2001 interim support judgment, which was affirmed in *Beal I,* we reverse it.[45]

### F. The Superior Court Did Not Abuse Its Discretion by Deducting from the Interim Support Judgment a $56,017 Credit for Mortgage Principal Reduction due to David's Post–Separation Mortgage Payments.

During the pendency of the divorce, Annette resided in the family home and David was ordered to pay the mortgage as part of his interim support obligation. In the March 2001 property division, Annette was awarded the home, which Judge Gonzalez valued at $1,100,000, subtracting a mortgage principal balance of $765,219 and selling costs of $66,000, to arrive at an equity value of $268,781.[46]

In *Beal I* David argued that Judge Gonzalez had undervalued the parties' home in the property division because he had used an outdated number for the net equity.[47] David contended that because the value of the home's equity had been augmented by his post-separation mortgage payments, he should be given a credit against the interim support judgment to offset the undervaluation of the home's equity and to balance the property division.[48] David initially requested this credit in response to Annette's post-trial filing of a judgment for unpaid interim support.[49] His request was denied, and he appealed its denial in *Beal I.*[50] This court rejected Annette's contention that David's request was untimely and remanded the issue to the superior court "to consider whether David should receive credit for post-separation mortgage payments that were part of his interim support payments." [51]

On remand, Judge Morse found that the home had indeed been undervalued in the March 2001 property division because the mortgage debt had been only $709,202 at the time of the August 2000 trial, not $765,219.[52] Judge Morse also found that the $56,017 reduction of the mortgage principal had been caused by post-separation mortgage payments for June 1999 through August 2000 made from David's separate property. The parties do not dispute this finding. Judge Morse elected to credit David for this $56,017 reduction of the mortgage principal, having been made aware that Annette had sold the house for $200,000 more than the value it was given in the property division.

The parties do not dispute Judge Morse's decision to award David some sort of credit for the $56,017 reduction of the mortgage principal, but they dispute the manner in

---

43. *State, Commercial Fisheries Entry Comm'n v. Carlson,* 65 P.3d 851, 859 (Alaska 2003) (footnotes and internal quotation marks omitted).

44. *Id.* at 873–74.

45. To be sure, the superior court acted within its authority to the extent that in determining the remaining amount owed by David under the interim support judgment it accounted for payments made towards the judgment *after Beal I,* such as the payments to Annette out of the supersedeas bond funds. If the $12,918.86 in question actually reflects such later payments, rather than payments that should have been factored into the judgment in the first place, the superior court should make this clear on remand.

46. *Beal I,* 88 P.3d at 116–17.

47. *Id.* at 116.

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.*

52. The mortgage payments resulting in this principal reduction were not actually made by David, but rather were made by Annette with funds obtained from the sale of David's separate property.

which he awarded David the credit. Judge Morse awarded David the credit by deducting $56,017 from the remaining amount owed by David under the interim support judgment. Annette argues that Judge Morse thus improperly treated the $56,017 as interim support. David counters that because he was ordered to pay the mortgage as part of his interim support obligation, the $56,017 reduction of the mortgage principal can properly be characterized as interim support.

Both parties fail to recognize that although Judge Morse deducted the $56,017 from the amount David still owed on the interim support judgment, there is no indication that he did so because he considered the $56,017 to be a form of interim support. Various credits to David in conjunction with the property division have been treated as potential "offsets" to the amount owed by David under the interim support judgment despite the fact that they have nothing to do with interim support.[53] To the extent that there were errors in the property division that resulted in Annette receiving more than her share, it makes sense to account for these errors after the fact by simply deducting the amount Annette was overpaid in the property division from the amount that David still owes her on the interim support judgment,[54] regardless of whether such deductions can be properly characterized as interim support payments. Such accounting does not, as Annette contends, constitute impermissible mixing of the separate concepts of interim support and marital property.

 The question thus becomes simply whether Judge Morse erred by awarding David dollar-for-dollar credit for the entire $56,017 post-separation reduction of the mortgage principal, rather than dividing that amount 55/45 as Annette contends would be proper. "We review for abuse of discretion a superior court's decision whether to give a credit to a spouse for payments made to maintain marital property, such as the family home," in making a property division.[55] The trial court is required "to make factual findings on whether a credit is appropriate"[56] but there is "no fixed rule" regarding whether a spouse should be given credit for post-separation mortgage payments.[57] Whether to award credit for post-separation mortgage payments is within the discretion of the superior court in carrying out its task of creating an equitable distribution of property.[58] In this case it is not credit for the mortgage payments themselves that is at issue, but credit for the principal reduction effected by those mortgage payments. When fashioning a property division, the trial court has the discretion, where equitable, to give a spouse dollar-for-dollar credit for the entire amount of his or her post-separation mortgage payments. It thus follows that the trial court also has the discretion to give that spouse credit for the increase in home equity created by those mortgage payments—an invariably smaller amount.

Judge Morse discussed the reasoning behind his treatment of the $56,017 credit, explaining that he

did not divide [the $56,017] according to the percentage division of the marital estate because it was paid by the time of the sale by Annette after she sold a variety of

**53.** *See Beal I*, 88 P.3d at 115–18 (discussing various credits David requested to offset the amount of money he owed Annette under the interim support judgment, including credits for property division matters such as the selling costs of the parties' home and the valuation of a table).

**54.** Such a deduction should be made retroactive to the date the overpayment occurred—here, this would be the date the home was sold because that is the date on which Annette received the benefit of the undervaluation of the home in the property division.

**55.** *Berry v. Berry*, 978 P.2d 93, 95 (Alaska 1999).

**56.** *Id.* at 96.

**57.** *Id.* (quoting *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992)).

**58.** *See id.* ("[T]he fact that one party has made payments from non-marital income to preserve marital property should be considered as one of the circumstances to be weighed by the trial court in dividing the marital property." (quoting *Ramsey*, 834 P.2d at 809)); *see also* 2 Brett R. Turner, Equitable Distribution of Property § 6:86, at 458–63 (3d ed.2005) (recognizing that most courts have treated this issue as completely discretionary, though advocating a more structured approach).

marital and David's separate assets. The division of that equity has been done in other aspects of the reconciliation with the treatment of the assets used to pay the principal.

 Judge Morse apparently decided that the property division would be best balanced if David were awarded credit for the entire $56,017, given "the treatment of the assets used to pay the principal." The assets used to pay the principal were David's separate property, and thus the $56,017 in increased equity could reasonably be treated as David's separate property.[59] Annette has offered no argument as to why Judge Morse's decision to credit David with the entire $56,017 reduction in the mortgage principal has made the overall property division inequitable. Because "[t]he trial court has broad discretion to make a property division in the manner it determines to be most equitable," we will not disturb a property division unless it is "clearly unjust."[60] Accordingly, we affirm the $56,017 mortgage reduction credit.

### G. The Superior Court Did Not Abuse Its Discretion by Awarding David a Further $10,869.68 Mortgage Reduction Credit Against the Interim Support Judgment.

Though the trial was held in August 2000, David's obligation to pay the mortgage on the family home while Annette resided there continued from September 2000 through March 6, 2001, when the divorce was finalized. David did not make any of the required mortgage payments during those months, and neither did Annette. In April 2001 a judgment was issued against David in favor of Annette for unpaid interim support, which included these unpaid mortgage payments. Once the house was sold and the mortgage was no longer in existence, David was liable directly to Annette for the unpaid mortgage payments because they were incorporated into the interim support judgment against him. Most of the interim support judgment was paid to Annette around July and December 2004 when the supersedeas bond funds were distributed, meaning that the mortgage payments from September 2000 to March 2001, which were meant to be payments to maintain marital property, were effectively paid directly to Annette. David's accountant estimated that a $24,154.84 portion of these mortgage payments would have gone to reduction of the mortgage principal on the family home if they had been paid to the bank as ordered, rather than to Annette.

 As discussed in the previous section, our *Beal I* decision instructed the superior court "to consider whether David should receive credit for post-separation mortgage payments that were part of his interim support payments."[61] Judge Morse decided to give David both the $56,017 mortgage credit discussed above as well as a $10,869.68 mortgage credit that represented 45% of the $24,154.84 principal reduction portion of the mortgage payments that were incorporated into the interim support judgment. Judge Morse reasoned that Annette would gain a "windfall" if allowed to retain the entirety of the mortgage payments incorporated into the interim support judgment because those payments were meant to maintain marital property for the benefit of both parties rather than to go directly to Annette. Thus, in order to balance the property division, Judge Morse decided to "put the parties in the positions they would have been in had David fulfilled his monthly payment obligations in a timely manner" by giving David a credit for the portion of the marital equity that the payments would have created if they had been made to the bank as originally contemplated, rather than to Annette after the sale of the house. Though Judge Morse was not required to give David this credit, it was within his broad discretion in balancing the property division to do so.[62] We will not

---

59. *See, e.g., Brown v. Brown,* 914 P.2d 206, 208 (Alaska 1996) (affirming superior court's treatment of the equity created by one spouse's post-separation mortgage payments as that spouse's separate property).

60. *Conner v. Conner,* 68 P.3d 1232, 1234–35 (Alaska 2003).

61. 88 P.3d 104, 116 (Alaska 2004).

62. *Conner,* 68 P.3d at 1234 ("The trial court has broad discretion to make a property division in

disturb a property division unless it is "clearly unjust."[63] We note that David certainly has not benefited from his failure to make the mortgage payments on time, as he has been charged an 8.5% post-judgment interest rate on the interim support judgment, which included the unpaid mortgage payments. Accordingly, we affirm the $10,869.68 mortgage reduction credit.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's educational support award, its refusal to make an equitable adjustment to the interest owed by David, and its award of $56,017 and $10,869.68 mortgage credits to David. We REVERSE the superior court's revaluation of the appreciation of David's pre-marital artwork and its award of a $12,918.86 credit to David for payments to CSED made before the interim support judgment was entered.

MATTHEWS, Justice, not participating.

the manner it determines to be most equitable...."); *Ramsey,* 834 P.2d at 809 (holding that there is "no fixed rule" requiring credit for post-separation payments made to maintain marital property).

63. *Conner,* 68 P.3d at 1234–35.